# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

```
-------------------------------------------------------------x
RICKY HILL,                                  :
                                             :
                 Plaintiff,                  :
                                             :      Case No. 1:22-cv-02961
       v.                                    :
                                             :      Hon. Jorge L. Alonso
AMB SPORTS & ENTERTAINMENT, LLC (d/b/a       :      Hon.  Jeffrey T. Gilbert (Mag.)
Atlanta United FC); INTER MIAMI CF, LLC; LAS :
VEGAS SOCCER LLC (d/b/a Las Vegas Lights FC);:
MAJOR LEAGUE SOCCER, LLC; MEMPHIS 901        :
FC LLC; PRODIGAL SOCCER, LLC (d/b/a OKC      :
Energy FC); TEPPER SPORTS & ENTERTAIN-       :
MENT (d/b/a Charlotte FC); UNITED SOCCER     :
LEAGUES, LLC,                                :
                                             :
                 Defendants.                 :
-------------------------------------------------------------x
```

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
<u>RESPECTIVE MOTIONS TO DISMISS AND/OR TRANSFER</u>**

Steven M. Shebar
SHEBAR LAW FIRM
0N370 Fanchon St.
Wheaton, Illinois 60187
(630) 877-6833
steveshebar@shebarlaw.com

Lisa K. Shebar
LAW OFFICE OF LISA K. SHEBAR
110 N. Gables Blvd.
Wheaton, IL 60187
(630) 877-6829
lisa.shebar@gmail.com

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

TABLE OF CASES ................................................................................................. iii

INTRODUCTION ...................................................................................................1

FACTS PERTINENT TO MOTIONS.......................................................................2

    Atlanta United FC: Hill's Application for the Open Head Coach and
    Academy Director Positions ...........................................................................3

    Inter Miami CF: Hill's Application for the Open Academy Director Position ..................4

    Las Vegas Lights FC: Hill's Application for the Open Head Coach and
    Technical Director Positions...........................................................................5

    Memphis 901 FC: Hill's Application for the Open Head Coach Position .........................6

    OKC Energy FC: Hill's Application for the Open Head Coach Position...........................7

    Charlotte FC: Hill's Application for the Open Head Coach Position................................7

    The Club Defendants' Contacts with Illinois.......................................................8

    Chicago, Illinois, is Home to the Governing Body for All of U.S. Professional
    Soccer..................................................................................................8

    MLS's Ownership and Control of Its Member Clubs.............................................9

    USL's Ownership of Multiple Soccer Clubs Based in Illinois ...........................9

ARGUMENT .......................................................................................................10

I.    Plaintiff Voluntarily Withdraws His Claims Under the IHRA. .........................10

II.    Plaintiff's Claims Are Not Based on Time-Barred Incidents of Discrimination..............10

III.    The Club Defendants Are Top U.S. Professional Soccer Clubs that Are
    Subject to Jurisdiction in Illinois. ..............................................................12

        A.    Each of the Club Defendants is subject to the general jurisdiction of
        the Court........................................................................................12

        B.    In the alternative, the Court should order jurisdictional discovery......................13

**Page**

C.       The Defendants' discriminatory failures to hire Plaintiff constitute the commission of a tort in Illinois, giving rise to long-arm jurisdiction. ...................14

IV.     Defendant MLS's Arguments for Dismissal or Transfer Are Without Merit....................15

A.       Venue is proper in this District for Plaintiff's Title VII claim against MLS. ...................................................................................................................15

1.       Plaintiff has properly alleged that MLS's unlawful employment practice was committed in this District.................................16

a.       MLS's unlawful employment practice occurred in Chicago. ........................................................................17

b.       The effect of MLS's unlawful employment practice was felt by Plaintiff in Chicago. ...................................18

2.       Plaintiff's allegations of unlawful employment practices by MLS's clubs are the legal equivalent of allegations of unlawful employment practices by MLS....................................19

3.       MLS's claim of improper venue for Plaintiff's Title VII claim is contrary to public policy. ..........................................20

4.       MLS has asserted no viable basis for venue elsewhere for Plaintiff's Title VII claim against MLS....................................21

B.       Transfer to New York on the ground of *forum non conveniens* is inappropriate. ...............................................................................................23

V.      The Complaint States Plausible, Legally-Cognizable Claims Against Every Defendant..................................................................................................................25

A.       Plaintiff has stated viable discrimination claims against MLS.............................25

B.       Plaintiff has stated viable discrimination claims against USL.............................26

C.       Plaintiff has stated viable discrimination claims against Las Vegas Soccer..................................................................................................................27

D.       Plaintiff has stated viable discrimination claims against Prodigal Soccer, LLC. .........................................................................................................27

CONCLUSION...............................................................................................................29

## TABLE OF CASES

**Cases**                                                                                           **Page(s)**

*Cook v. UBS Fin. Servs., Inc.*,
No. 05-cv-8842, 2006 WL 760284 (SHS) (S.D.N.Y. Mar. 21, 2006)..........................................21

*Davis v. Pierce Co., Inc.*,
No. 06 C 6886, 2007 WL 9814708 (N.D. Ill. Sept. 11, 2007)......................................................18

*Digan v. Euro-Am. Brands, LLC*,
No. 10-CV-799, 2010 WL 3385476 (N.D. Ill. Aug. 19, 2010) ...................................................18

*Doe #1 v. JetBlue Airways Corp.*,
No. 19-CV-1542, 2020 WL 4605216 (E.D.N.Y. Aug. 11, 2020) ......................................... 21-22

*EEOC v. Dial Corp.*,
No. 99 C 3356, 2001 WL 1945088 (N.D. Ill. Dec. 27, 2001) .....................................................11

*EEOC v. Simply Storage Mgmt., LLC*,
No. 109-cv-1223, 2010 WL 11583154 (S.D. Ind. Sept. 7, 2010)...............................................11

*EEOC v. Wyndham Worldwide Corp.*,
2008 WL 4527974 (W.D. Wash. 2008)......................................................................................11

*Eiler v. S.D. Human Servs. Ctr.*,
736 Fed. App'x 145 (7th Cir. 2018) ...........................................................................................14

*Fraser v. Major League Soccer, L.L.C.*,
284 F.3d 47 (1st Cir. 2002)..........................................................................................................19

*Gilman Opco LLC v. Lanman Oil Co.*,
No. 13-CV-7846, 2014 WL 1284499 (N.D. Ill. Mar. 28, 2014)................................................22

*Guaranteed Rate, Inc. v. Rorvig*,
No. 22 CV 2342, 2022 WL 4182436 (N.D. Ill. Sept. 13, 2022)................................................13

*Gwin v. Reynolds & Reynolds Co.*,
No. 01 C 770, 2001 WL 775969 (N.D. Ill. Jul.10, 2001) ...................................................... 15-16

*Handler v. Kenneth Allen & Assocs.*,
*P. C.*, 2011 WL 1118499 (N.D. Ill. Mar. 24, 2011).....................................................................24

*Hellman v. Royal Caribbean Int'l*,
No. 04 C 4041, 2005 WL 1631135 (N.D. Ill. July 8, 2005) ......................................................15

**Cases**                                                                    **Page(s)**

*In re National Presto Indus., Inc.,*
347 F.3d 662, 663-64 (7th Cir. 2003) .................................................................. 23-24

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945)............................................................................................12

*J.A.G.P. through Lopez v. Aerolineas Damojh, S.A. de C.V.,*
No. 1:19-CV-02552, 2021 WL 5998511 (N.D. Ill. Dec. 19, 2021)................................13

*Luderus v. U.S. Helicopters, Inc.,*
No. 12-CV-5094, 2013 WL 677814 (N.D. Ill. Feb. 25, 2013) ................................ 20-21

*Majumdar v. Fair,*
567 F. Supp. 3d 901 (N.D. Ill. 2021) ........................................................................12

*Martinez v. Clarian Health Partners, Inc.,*
No. 1:12-cv-00567, 2014 WL 545893 (S.D. Ind. Feb. 10, 2014)................................11

*Nathan v. Morgan Stanley Renewable Dev. Fund, LLC,*
No. 11 C 2231, 2012 WL 1886440 (N.D. Ill. May 22, 2012) ....................................15, 16, 18, 19

*National R.R. Passenger Corp. v. Morgan,*
536 U.S. 101 (2002)............................................................................................11

*Nowak v. Major League Soccer, LLC,*
No. CV 14-3503, 2015 WL 12803590 (E.D. Pa. July 20, 2015)................................19

*Passantino v. Johnson & Johnson Consumer Products, Inc.,*
212 F.3d 493 (9th Cir. 2000) ...................................................................................21

*Perkins v. Silverstein,*
939 F.2d 463 (7th Cir. 1991) ...................................................................................28

*Pryor v. United Air Lines, Inc.,*
No. 12-CV-5840, 2013 WL 4506879 (N.D. Ill. Aug. 23, 2013) ....................................15, 18, 24

*Real Colors, Inc. v. Patel,*
974 F. Supp. 645 (N.D. Ill. 1997) ........................................................................ 14-15

*Regency Com. Assocs. LLC v. Action 49 Junction I, LLC,*
No. 3:17-cv-00143-WTL-MPB, 2017 WL 5287168 (S.D. Ind. Nov. 13, 2017) ..........................13

*Robinson v. Potter,*
No. 04-cv-890, 2005 WL 1151429 (D.D.C. May 16, 2005)........................................22

**Cases**                                                   **Page(s)**

*Summerland v. Exelon Generation Co.,*
510 F. Supp. 3d 619 (N.D. Ill. 2020) ........................................................................15, 26

*Snyder v. Smith*,
736 F.2d 409, 416 (7th Cir.1984), *cert. denied*, 469 U.S. 1037 (1984).........................14

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) ...........................................................................................12

*Ticketreserve, Inc. v. Viagogo, Inc.*,
656 F. Supp. 2d 775 (N.D. Ill. 2009) ...............................................................................13

*Wahba v. Kellogg Co*.,
No. 12 C 6975, 2013 WL 1611346 (N.D. Ill. Apr. 12, 2013)................................... 17-18

*Williams v. Am. Coll. of Educ., Inc.*,
No. 16-CV-11746, 2017 WL 2424227 (N.D. Ill. June 5, 2017)............................15, 18-19, 23-24

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

```
------------------------------------------------------------x
RICKY HILL,                            :
                                       :
                Plaintiff,             :
                                       :    Case No. 1:22-cv-02961
        v.                             :
                                       :    Hon. Jorge L. Alonso
AMB SPORTS & ENTERTAINMENT, LLC (d/b/a :    Hon.  Jeffrey T. Gilbert (Mag.)
Atlanta United FC); INTER MIAMI CF, LLC; LAS :
VEGAS SOCCER LLC (d/b/a Las Vegas Lights FC);:
MAJOR LEAGUE SOCCER, LLC; MEMPHIS 901  :
FC LLC; PRODIGAL SOCCER, LLC (d/b/a OKC :
Energy FC); TEPPER SPORTS & ENTERTAIN-  :
MENT (d/b/a Charlotte FC); UNITED SOCCER :
LEAGUES, LLC,                          :
                                       :
                Defendants.            :
------------------------------------------------------------x
```

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
RESPECTIVE MOTIONS TO DISMISS AND/OR TRANSFER**

Plaintiff, Ricky Hill ("Plaintiff" or "Hill"), by his undersigned counsel of record, hereby submits his Response in Opposition to Defendants' Respective Motions to Dismiss and/or Transfer.

## INTRODUCTION

Illinois, and Chicago in particular, is a national hub for U.S. professional soccer. It has one of the largest markets for the sport in the country, which is continuing to grow. Youth soccer participation in Illinois has been rising exponentially over the past decade. It is no accident that the U.S. Soccer Federation ("U.S. Soccer"), which is the governing body for all of U.S. professional soccer, is located in Chicago. Every Defendant herein relies on U.S. Soccer for its status as a sanctioned professional club or league in this country. For that reason alone, it would

be very difficult to imagine a U.S. professional men's soccer club existing without continuous, purposeful contacts with Illinois.

In addition, each of the defendant soccer clubs in this case (the "Club Defendants"), habitually and purposely avails itself of the benefits of Illinois' highly developed soccer market by, among other things, recruiting staff and players here, marketing and selling merchandise and tickets to their fans to encourage attendance at "away" games at Chicago's Soldier Field. *See* FACTS at p. 7, *infra.*

In the alternative, there is, at a minimum, the required "colorable basis" to meet the threshold for permitting Plaintiff to conduct jurisdictional discovery, to further demonstrate, support and supplement the Club Defendants' jurisdictional connections to Illinois, many of which have already been identified herein. *See* FACTS p. 8; ARG. III (B), *infra.*

Also demonstrated in detail below are the grounds for specific jurisdiction under Illinois' long-arm statute (FACTS pp. 3-7; ARG. III (C)), the timeliness and legal sufficiency of Plaintiff's claims (FACTS; ARG. II, V) and the appropriateness of venue in this federal district (ARG. IV)

## FACTS PERTINENT TO MOTIONS

Hill is an internationally acclaimed soccer player, and highly successful and decorated coach of professional men's soccer clubs. As detailed in the Complaint ("Compl."), during the past several years, Hill, who is Black, has applied for coaching and technical positions at each of the U.S. professional men's soccer clubs named as Defendants in this lawsuit. In every case, Hill was denied the position, and it was filled by a non-Black candidate. The following interactions between Hill and/or one of his agents on the one hand, and representatives of the respective Club Defendants on the other, are excerpted from the Complaint.

2

**Atlanta United FC:**
**Hill's Application for the Open Head Coach and Academy Director Positions**

Kieren Keane is and has been, at all times referenced herein, Hill's agent for purposes of procuring employment with, among others, each of the Club Defendants. Declaration of Kieren Keane, filed herewith ("Keane Declaration" or "Keane Dec."), ¶ 1. Keane also is and has been, at all times referenced herein, a resident of Chicago Illinois. *Id.* Unless otherwise noted herein, Keane was situated in Illinois at all times when making and receiving communications from the Club Defendants. *Id.*

Acting on Hill's behalf as his agent, Keane attempted to make contact with Darren Eales by phone on March 25, 2021, while Eales was President and CEO of Atlanta United. *Id.* ¶ 2. Keane left a voicemail message expressing Hill's interest in the then-vacant Atlanta United 2 head coaching position. Keane also sent Eales a text message requesting a suitable time to connect with him regarding Hill's interest. *Id.*

After following up several times, Keane received an email from Eales' assistant, Patricia Johnson, on April 5, 2021, stating in part that, "Unfortunately due to the high volume of applicants, we are unable to provide individual updates on applicant status, but we will be in touch should there be any interest." Keane Dec. ¶ 3. Keane replied to Johnson by email on April 7, 2021, stating, in substance, that Hill's resume far exceeded those of the two previous incumbents in the Atlanta United 2 head coach (Stephen Glass) and Academy Director (Tony Annan) roles, and inquiring as to why Hill would not be a candidate of interest, or even worthy of an interview. *Id.*

In late April of 2021, Eales informed Hill that Carlos Bocanegra, then Technical Director for Atlanta United, was conducting the recruitment process for both of the aforementioned open positions. Compl. ¶ 37. Hill asked Eales whether consideration would be given to all candidates,

including those not already within the organization. Eales replied only that the positions were open and not presently internally filled and that Bocanegra would be in touch "shortly." *Id.* ¶ 38.

After three weeks with no further contact from Atlanta United, on or about May 12, 2021, Keane wrote to Eales and Bocanegra asking why neither he nor Hill had heard back from anyone, and whether the positions remained open. Keane Dec. ¶ 4. Later that day, Felipe Villahoz, Operations Coordinator, VP & Technical Director's Office of Atlanta United, contacted Hill asking if he would participate in a virtual (Zoom) interview the following week. Compl. ¶ 40. On May 19, 2021, Hill was interviewed via Zoom for about forty (40) minutes with Bocanegra, Villahoz and Johnathon Spector, Head of International Recruitment and Development for Atlanta United. *Id.* ¶ 41.

On May 28, 2021, Hill received a phone call in the evening from Bocanegra, who informed Hill that he would be promoting Jack Collison to the Atlanta United head coach position. Collison is a white, relatively inexperienced soccer coach, who was then working at an Academy position for Atlanta United. Bocanegra also explained during that phone call that he would be promoting Matt Lawrey -- who, like Collison, is also a white, relatively inexperienced soccer coach -- from his Academy Assistant Director's job to Academy Director for Atlanta United. *Id.* ¶¶ 42-43.

**Inter Miami CF:**
**Hill's Application for the Open Academy Director Position**

On April 19, 2021, Keane reached out on behalf of Hill to Inter Miami's new Chief Soccer Officer and Sporting Director, Chris Henderson, regarding the recently vacated position of Academy Director. Jason Kreis, who is white, and who had held that position, was elevated to assistant coach of Inter Miami's first Club. Keane Dec. ¶ 5.

On April 20, 2021, Henderson advised Keane to "please send to Mark Prizant" (Director of Scouting at Inter Miami). On April 22, 2021, Keane forwarded an email copying both

Henderson and Prizant, expressing Hill's interest in the vacant Academy Director's position and attaching his resume for their attention. *Id.* ¶ 6. Keane followed up again on April 28, 2021, and May 17, 2021, but received no response from either Henderson or Prizant. *Id.*

On May 26, 2021, Keane wrote to Henderson for the fifth time and Prizant for the fourth time, asking again whether the Academy Director position was still open and for Hill's resume to be considered. *Id.* ¶ 7. This time, Keane received a response from Prizant stating, "Kieren –Thanks for reaching out. Unfortunately, the position is no longer open. We will keep his CV on file." *Id.*

On May 27, 2021, Keane replied to Prizant, asking, "So I can best serve Hill going forward, would you mind letting us know the date the position was filled, and any constructive advice we can give him about why he wasn't considered for the job?" *Id.* ¶ 8. To date, there has been no response to Keane's last email. *Id.*

On June 17, 2021, Inter Miami announced that the Academy Director position was filled by Craig Dalrymple, a white, British coach with no professional playing career, no senior men's professional coaching career and limited Premiership environment youth Club experience. *Id.* ¶ 9.

**Las Vegas Lights FC:**
**Hill's Application for the Open Head Coach and Technical Director Positions**

In December of 2020, the position of head coach and technical director at the Las Vegas Lights was vacant. Keane Dec. ¶ 10. Hill personally attempted to make contact with the club's owner and general manager, Brett Lashbrook, via telephone calls to his cell phone. Lashbrook never responded. Compl. ¶ 84.

On January 25, 2021, Keane, on behalf of Hill, visited Las Vegas and sent emails, texts, and voicemails to Lashbrook, asking for an opportunity to meet with him and discuss Hill's potential consideration for the then-open head coach and technical director position at the Las

Vegas Lights. Keane Dec. ¶ 10. Lashbrook again failed to respond, and Hill was again passed over for the opportunity without explanation. Compl. ¶ 86.

On March 10, 2021, Steve Cherundolo was appointed as the head coach for the Las Vegas Lights. Cherundolo is a white, former US and international player with limited coaching experience, serving predominantly as an assistant coach since 2014. *Id.* ¶ 87.

On March 12, 2021, Las Vegas Lights announced a partnership with Los Angeles FC, of the MLS. Under the one-year partnership, the Las Vegas Lights FC became the USL affiliate of Los Angeles FC, and shared technical staff including the new head coach, Cherundolo. *Id.* ¶ 88.

### Memphis 901 FC:
### Hill's Application for the Open Head Coach Position

Keane on behalf of Hill reached out to Memphis 901 Sporting Director, Tim Howard, and his Assistant Sporting Director, James Roeling, on or about January 28, 2021, seeking consideration for the then-open head coach position. After not receiving a reply, Keane reached out again on or about February 5, 2021, for the same purpose. Keane Dec. ¶ 11.

Roeling later replied to Keane, "Thanks for reaching out. We are in the final stages of the process for interviewing head coaches so we aren't looking at any other applicants at this point unfortunately. We will keep you in mind in the future and let you know if anything changes." *Id.* ¶ 12. Memphis 901 eventually filled the vacant head coach position on or about April 8, 2021, by promoting interim head coach Ben Pirmann, who is white, to permanent head coach. This decision was taken a full eight weeks after Roeling claimed to Keane that the club was in the "final stages" of their interviewing process. *Id.*

### OKC Energy FC:
### Hill's Application for the Open Head Coach Position

On or about June 4, 2021, Keane on behalf of Hill emailed OKC Energy's general manager Jason Hawkins about filling the open head coach position. Keane emailed again on June 7, 2021, having received no response the first time. Keane Dec. ¶ 13. Keane emailed Hawkins again on June 11, 2021, this time copying Hill's Illinois counsel on the email, again asking whether the head coach position was still open, and whether there might be a good time to discuss Hill's credentials and suitability. *Id.*

Hawkins replied within about two hours, saying, "The position is still open and under consideration. I have forwarded his information on to our COO." *Id.* ¶ 14. Hill was given no further consideration and in June of 2021, the OKC Energy appointed former assistant coach, Leigh Veidman, who is white, as interim head coach. The club made him the permanent head coach on October 28, 2021. Compl. ¶¶ 126-27.

### Charlotte FC:
### Hill's Application for the Open Head Coach Position

Keane, on behalf of Hill, contacted the following persons within the Charlotte organization by email during June and July of 2021, in an effort to have Hill's resume reviewed and considered for the then-vacant head coach position. Keane Dec. ¶ 15. Keane contacted Nick Kelly (President), Zoran Krneta (Sporting Director) and Marc Nicholls (Technical Director) at various times, individually, and provided Hill's resume to each for consideration. *Id.*

No one on behalf of Charlotte has ever responded to Hill's application for employment with Charlotte. Compl. ¶ 135. On or about July 7, 2021, Charlotte hired Miguel Angel Ramirez, who is non-Black, for the head coach position. *Id.* ¶ 136.

## The Club Defendants' Contacts with Illinois

Plaintiff has been able to garner the facts set forth in detail on Exhibit A to the Declaration of Steven M. Shebar, filed herewith ("Shebar Declaration" or "Shebar Dec."), by conducting internet research, without the benefit of disclosures from the respective Defendants to whom they pertain. Summarized, these findings include (i) all Defendants regularly offer merchandise for sale to Illinois residents; (ii) all Defendants regularly make job postings to Illinois residents; (iii) all Defendants have either repeatedly acquired multiple players from the Chicago Fire (Illinois' MLS club) or recruited players from Illinois. In addition, there are other significant, ongoing contractual relationships between Illinois companies and various clubs (and likely others not yet discovered), such as Defendant AMB Sports & Entertainment, LLC's relationship with its insurance broker and risk management provider, Arthur J. Gallagher, headquartered in Rolling Meadows, Illinois. Shebar Dec., Ex. A.

## Chicago, Illinois, is Home to the Governing Body for All of U.S. Professional Soccer.

The United States Soccer Federation, commonly referred to as U.S. Soccer, is the sole, official governing body for the sport of soccer in the United States. *See* https://en.wikipedia.org/wiki/United_States_Soccer_Federation. ("U.S. Soccer Wiki"). U.S. Soccer is headquartered in Chicago, Illinois. *Id.* "The federation is a full member of FIFA and governs American soccer at the international, professional, and amateur levels, including: the men's and women's national Clubs, Major League Soccer, National Women's Soccer League, youth organizations, beach soccer, futsal, Paralympic and deaf national Clubs. U.S. Soccer sanctions referees and soccer tournaments for most soccer leagues in the United States." *Id.*

Both USL Championship and MLS leagues are sanctioned by U.S. Soccer. *See* U.S. Soccer Wiki. Both leagues are also members of its professional council. *Id.*

### MLS's Ownership and Control of Its Member Clubs

"MLS operates as a single-entity league, which means MLS, and not the individual Clubs, holds the contracts on players." *Id.* "MLS is a single entity in which each Club is owned by the league and individually operated by the league's investors." *See* https://en.wikipedia.org/wiki/Major_League_Soccer. In addition, according to the MLS's Constitution, each Club operator enters into a Club Operating Agreement with MLS. "All players are paid by MLS and player contracts are negotiated by the League Office." *See* https://socceresq.com/2019/11/03/a-look-at-the-mls-constitution-part-1/. "The Competition Guidelines contain the applicable rules and regulations relating to: League competition and playing rules; Negotiation and execution of player contracts; Player salaries; Player transfers; and Player roster rules." *Id.*

### USL's Ownership of Multiple Soccer Clubs Based in Illinois

Defendant USL, which is the league in which Club Defendants Las Vegas Soccer, Prodigal Soccer (OKC Thunder) and Memphis 901 compete, is firmly embedded in Illinois and derives continuous, substantial revenues from its multiple soccer clubs here. See "Experienced Executive to Lead Club Heading to Sterling Bay's Planned State-of-the-Art Soccer Stadium Development at Lincoln Yards," https://www.uslchampionship.com/news_article/show/916232, which reports:

> It speaks volumes about the growth of the USL when you continue to see interest and investment from proven sports business executives like Tom Ricketts," said USL CEO Alec Papadakis. "Over the last several years, we have assembled one of the most sophisticated and knowledgeable ownership groups in professional sports, drawn by our focus on building a sustainable, stable and professional organization with significant room for future growth. We welcome Tom and the entire Ricketts family to the USL. They bring a proven record of success to the team, and combined with the excellent folks at Sterling Bay, we look forward to their contributions to the future of professional soccer in Chicago.

*See also*, "Chicago City SC to Join USL League Two for the 2022 Season," https://www.uslleaguetwo.com/news_article/show/1162482, which reports:

> The United Soccer League (USL) today announced Chicago City SC as the latest club to join USL League Two. The club will compete in the Heartland Division beginning in the 2022 season.
>
> "We are thrilled to welcome yet another Chicago-based club to the Heartland Division," said USL League Two Vice President Joel Nash. "Chicago City SC is an excellent club whose leadership is focused on growing the game in the inner city. Chicago City currently offers a fantastic program for its youth players and is interested in creating an equally exceptional offering for pre professional players looking to develop their skill. We look forward to seeing the impact that this club will have in its region and on the growth of pre professional soccer within the United States.

In addition, the USL has an extensive list of affiliated clubs in Illinois, including: Chicago City SC, Chicago Inferno, CSA Impact United SC, Crystal Lake Force, Oak Brook SC, Chicago Rush SC (Boys and Girls Super Y League members); Chicago KICS (USL W Women's professional league), Men's and/or Women's USL 2 professional team members Chicago Dutch Lions FC, Chicago FC United, Springfield Athletic SC.

## ARGUMENT

### I.     Plaintiff Voluntarily Withdraws His Claims Under the IHRA.

Each Defendant has asserted that (i) Plaintiff has failed to exhaust his administrative remedies with respect to the IHRA and/or (ii) that they are not "employers" under the IHRA. Plaintiff has opted not to oppose these arguments and, instead, asks the Court to accept his voluntary withdrawal of Count 2 of the Complaint.

### II.     Plaintiff's Claims Are Not Based on Time-Barred Incidents of Discrimination.

Each Defendant has sought partial dismissal of Plaintiff's Title VII claims, to the extent they are based on events that took place more than 300 days prior to the date on which Plaintiff filed the respective charge with the EEOC. In addition, Defendant Las Vegas Soccer LLC has

sought dismissal of Plaintiff's Section 1981 claims to the extent they are based on events that took place more than two years prior to the filing of the Complaint.

As set forth in the FACTS, above, as to each Defendant, there is at least one allegedly actionable event that took place within the requisite timeframe for both Title VII and Section 1981. It is these events that form the legal basis for Plaintiff's Title VII and Section 1981 claims. The remaining allegations of similarly discriminatory conduct are included as relevant background facts in support of, for example, a pattern-or-practice claim of discrimination. *See EEOC v. Dial Corp.*, No. 99 C 3356, 2001 WL 1945088, at *4 (N.D. Ill. Dec. 27, 2001*)* ("evidence relating to time-barred allegations [of discrimination] can be relevant for background purposes with respect to the pattern-or-practice claim."); *EEOC v. Simply Storage Mgmt., LLC*, No. 109-cv-1223, 2010 WL 11583154, at *1 (S.D. Ind. Sept. 7, 2010) ("alleged harassment of employees whose claims are time-barred may be admitted in support of timely claims," *citing EEOC v. Wyndham Worldwide Corp*., 2008 WL 4527974 at *7-8 (W.D. Wash. 2008)); *Martinez v. Clarian Health Partners, Inc.*, No. 1:12-cv-00567, 2014 WL 545893, at *3 (S.D. Ind. Feb. 10, 2014) ("The Supreme Court has determined that even where alleged discriminatory acts are not actionable because they were not included in an EEOC charge of discrimination and were time barred, 'it may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue,' " *citing National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112 (2002)).

Accordingly, Plaintiff's actionable claims of discrimination in this case have all occurred within the statutory time limits. Defendants' motions seeking dismissal on this ground should be denied as to the timely claims and are inapposite as to the earlier incidents of discriminatory conduct.

III.     **The Club Defendants Are Top U.S. Professional Soccer Clubs that Are Subject to Jurisdiction in Illinois.**

Neither of the league Defendants, MLS and USL, contests personal jurisdiction. Accordingly, the Court should find that both entities are properly subject to the Court's jurisdiction. In determining whether the exercise of personal jurisdiction over the Club Defendants is proper, "the key question is . . . whether the defendants have sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.' " *Majumdar v. Fair*, 567 F. Supp. 3d 901, 907 (N.D. Ill. 2021) (Alonso, J.) (*citing Tamburo v. Dworkin*, 601 F.3d 693, 700-01 (7th Cir. 2010) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Each of the Club Defendants depends upon its relationship with U.S. Soccer in Chicago, Illinois, for its status in one of the top two tiers of U.S. professional soccer. Each club also benefits from its participation in a league that derives constant revenue from professional and business activities in Illinois. Further, specific jurisdiction exists over the Club Defendants under Illinois' long-arm statute because each has committed the tortious act of discrimination causing injury in Illinois.

A.       **Each of the Club Defendants is subject to the general jurisdiction of the Court.**

Each of the Club Defendants argues that they are not subject to the Court's general jurisdiction because they have virtually no contacts with Illinois. However, as set forth in the FACTS above and in Exhibit A to the Shebar Declaration, each such Defendant maintains continuous and substantial business relationships and activities directed at Illinois, such that the exercise of personal jurisdiction over each of them comports with traditional notions of fair play and substantial justice.

**B.** **In the alternative, the Court should order jurisdictional discovery.**

If the Court finds that the facts that Plaintiff has been able to garner without the benefit of disclosure by the Club Defendants to be insufficient to establish personal jurisdiction based on their contacts with Illinois, Plaintiff submits that he has met the "low threshold" of demonstrating a "colorable claim" that "jurisdiction might exist," for the Court to authorize jurisdictional discovery under the law of this Circuit. *See Ticketreserve, Inc. v. Viagogo, Inc*., 656 F. Supp. 2d 775, 782 (N.D. Ill. 2009) ("Generally, courts grant jurisdictional discovery if the plaintiff can show that the factual record is at least ambiguous or unclear on the jurisdiction issue."); *Guaranteed Rate, Inc. v. Rorvig*, No. 22 CV 2342, 2022 WL 4182436, at *3 (N.D. Ill. Sept. 13, 2022) (colorable claim); *J.A.G.P. through Lopez v. Aerolineas Damojh, S.A. de C.V.*, No. 1:19-CV-02552, 2021 WL 5998511, at *2 (N.D. Ill. Dec. 19, 2021) ("Given the relatively low threshold required to set forth a *prima facie* case, the Plaintiffs have met their burden here and jurisdictional discovery is appropriate."); *Regency Com. Assocs. LLC v. Action 49 Junction I, LLC*, No. 3:17-cv-00143-WTL-MPB, 2017 WL 5287168, at *3 (S.D. Ind. Nov. 13, 2017) ("A party must make a *prima facie* showing with some competent evidence demonstrating that jurisdiction might exist in order to be entitled to jurisdictional discovery.").

Among the topics on which Plaintiff would seek discovery are each of the respective Club Defendants': (i) business and financial contracts, connections and dealings with Illinois citizens or entities; (ii) relationships with and activities involving their governing body, U.S. Soccer; (iii) relationships with their respective league co-Defendants (both of whom are subject to personal jurisdiction in Illinois), including financial relationships, allocation of revenues, corporate formalities; (iv) recruitment of players and other personnel in Illinois; and (v) merchandising and marketing activities directed to Illinois.

### C.   The Defendants' discriminatory failures to hire Plaintiff constitute the commission of a tort in Illinois, giving rise to long-arm jurisdiction.

Each of the Club Defendants argues essentially that Plaintiff's residence alone is insufficient to establish sufficient contacts with Illinois for purposes of specific jurisdiction. Each also relies on the same unpublished decision, *i.e., Eiler v. S.D. Human Servs. Ctr.,* 736 Fed. App'x 145 (7th Cir. 2018), purportedly for the proposition that an out-of-state defendant must initiate contact with the plaintiff in order to be subject to specific jurisdiction. However, *Eiler* involves a different section of the Illinois long-arm statute, 735 ILCS 5/2-209(c), rather than the applicable section 209(a)(2), which addresses jurisdiction arising from a tort committed in the State.

In their arguments, the Club Defendants do not address the primary source of specific jurisdiction over them in this case: the commission of the tort of discrimination under the Illinois long-arm Statute, 735 ILCS 5/2-209. That statute provides, in pertinent part,

> Sec. 2-209. Act submitting to jurisdiction - Process.
>
>   (a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:
>
> . . .
>
>    (2) The commission of a tortious act within this State[.]

735 ILCS 5/2-209(a)(2).

Moreover, the Seventh Circuit and U.S. Supreme Court have confirmed that, "[a] single tortious act committed in Illinois confers jurisdiction under the statute, as long as the acts giving rise to the claim are the same acts conferring jurisdiction. *Snyder v. Smith*, 736 F.2d 409, 416 (7th Cir. 1984), *cert. denied,* 469 U.S. 1037 (1984). *See also Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 649-50 (N.D. Ill. 1997) (even "where there is just one telephone call made, that call can give

rise to jurisdiction in Illinois . . . if the call constitutes the commission of a tortious act within Illinois").

In the case at bar, each of the Club Defendants committed the tortious act of discrimination against the Plaintiff in Illinois. *See Summerland v. Exelon Generation Co.,* 510 F. Supp. 3d 619, 631 (N.D. Ill. 2020) ("[T]he Seventh Circuit has observed that federal employment discrimination laws create "statutory torts."); *Williams v. Am. Coll. of Educ., Inc*., No. 16-CV-11746, 2017 WL 2424227, at *6 (N.D. Ill. Jun. 5, 2017) (finding, for venue purposes, that a discriminatory termination takes place where the plaintiff is located when terminated, because "the effects of [the defendant's] alleged harassment, discrimination, and retaliation were felt by [p]laintiff where she lived and worked, not at the location of the corporate headquarters") (*citing Pryor v. United Air Lines, Inc.,* No. 12-cv-5840, 2013 WL 4506879, at *7 (N.D. Ill. Aug. 23, 2013) (same)).

## IV. **Defendant MLS's Arguments for Dismissal or Transfer Are Without Merit.**

### A. **Venue is proper in this District for Plaintiff's Title VII claim against MLS.**

MLS argues that the Court should dismiss Plaintiff's Title VII claim against MLS for improper venue. In deciding a motion to dismiss for improper venue, "the court takes the plaintiff's well pleaded allegations as true and may consider facts outside the complaint." *Hellman v. Royal Caribbean Int'l*, No. 04 C 4041, 2005 WL 1631135 at *1 (N.D. Ill. July 8, 2005). "Any factual conflicts in the parties' submissions are resolved in the plaintiff's favor." *Id*.

MLS correctly notes that Title VII contains its own venue provision, 42 U.S.C. § 2000e–5(f)(3), which "is the exclusive venue provision for all Title VII . . . actions." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *11 (N.D. Ill. May 22, 2012) (quoting *Gwin v. Reynolds & Reynolds Co*., No. 01 C 770, 2001 WL 775969, at *1 (N.D.

Ill. Jul.10, 2001)). However, MLS incorrectly concludes that such provision renders venue in this District improper.

Under this provision, venue for Plaintiff's Title VII claim is proper (1) in any judicial district in the state in which the unlawful employment practice is alleged to have been committed; (2) in the judicial district in which the employment records relevant to such practice are maintained and administered; or (3) in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(f)(3). The provision also states that, if the "respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office." *Id*.

Plaintiff need only satisfy one of these requirements to demonstrate that venue is proper in this District. *Nathan*, 2012 WL 1886440, at *11. As set forth below, venue is proper under at least the first condition listed in Title VII's venue provision.

### 1. Plaintiff has properly alleged that MLS's unlawful employment practice was committed in this District.

Under Title VII's venue provision, venue is proper "in any judicial district in the state in which the unlawful employment practice is alleged to have been committed." 42 U.S.C. § 2000e–5(f)(3). Plaintiff has met this requirement by alleging, *inter alia*, that MLS – through its clubs, which "operate generally under the auspices, stewardship and governance of" MLS (Compl. ¶ 150) – "engages in a pattern and practice of hiring and promoting from within, and otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically largely (if not totally) exclude Blacks from upper-level coaching and technical staffing positions" (Compl. ¶¶ 89, 130, 141), and that MLS has "given [its] tacit, if not explicit, authorization and approval of the discriminatory acts alleged herein." Compl. ¶ 153. Plaintiff has further alleged that these "unlawful employment practices and/or omissions were committed in whole or in part, in this

16

District." Compl. ¶ 6. Plaintiff has met his burden of properly alleging under Title VII that MLS's unlawful employment practice was committed in this District.

MLS incorrectly argues that "Plaintiff does not identify a single alleged unlawful employment practice committed by MLS that occurred in this District, nor does he allege that he sought employment in this District . . . [n]or could he, given that none of the Defendants are [sic] based in this District." (MLS Mot., p. 3.) Not only do MLS's arguments ignore and misconstrue Plaintiff's allegations, but they are contrary to law regarding venue for Title VII claims.

### a.    <u>MLS's unlawful employment practice occurred in Chicago.</u>

The unlawful employment practice of MLS that Plaintiff alleges, as set forth above, occurred in this District each time that Plaintiff – whether directly or through his agent, Kieren Keane – while located in Chicago, Illinois (Compl. ¶ 7), provided Plaintiff's information to an MLS club and was then denied employment due to Defendants' discriminatory acts. This Court's opinion in *Wahba v. Kellogg Co.*, No. 12 C 6975, 2013 WL 1611346 (N.D. Ill. Apr. 12, 2013), is instructive in this respect.

Dr. Wahba, the plaintiff in *Wahba*, sued the corporate defendant, Kellogg, for age discrimination after Kellogg interviewed him for a job by telephone in Chicago and asked his birthdate, which he provided. If Kellogg had next failed to hire Dr. Wahba, the unlawful employment practice would have been deemed to have occurred in Chicago, as alleged by Dr. Wahba. Instead, however, the *Wahba* court stated:

> But it is noteworthy that his application did not end with the telephone interview. Rather, even though the Kellogg interviewers apparently knew Dr. Wahba's age, they invited him to Battle Creek[, Michigan,] for a face-to-face interview. It was only after the face-to-face interview in Battle Creek that he was turned down. Given these events, the Court concludes that the "unlawful employment practice," assuming there was one, took place in the Western District of Michigan, not in the Northern District of Illinois.

17

*Id.* at *2. *See also Davis v. Pierce Co., Inc.*, No. 06 C 6886, 2007 WL 9814708, at *5 (N.D. Ill. Sept. 11, 2007) (venue for a Title VII claim would exist where the interview of the plaintiff occurred).

Here, while Plaintiff and/or his agent was in Chicago, he was denied employment by each MLS club after having provided his information to each such club while he was in Chicago, resulting in the unlawful employment practice by MLS occurring in this District. Accordingly, as suggested by this Court in *Wahba*, venue for Plaintiff's Title VII claim against MLS is proper in this District since this District is where Plaintiff's employment applications with the MLS clubs began and ended.

**b.      The effect of MLS's unlawful employment practice was felt by Plaintiff in Chicago.**

Venue is additionally proper in the District because, in Title VII cases, courts recognize that the location where the plaintiff "suffered from the unlawful employment practice" – *i.e.,* in this case, Chicago – "is a key situs of material events." *Williams,* 2017 WL 2424227, at *6 (N.D. Ill. Jun. 5, 2017). As this Court explained in *Williams*:

> In *Pryor v. United Air Lines, Inc.*, No. 12-CV-5840, 2013 WL 4506879, at *7 (N.D. Ill. Aug. 23, 2013), for example, the court found that a Title VII case should be transferred to Virginia because even though the employment decision may have been made at the defendant's corporate headquarters in Chicago, the plaintiff-employee felt the effects of the relevant employment decision in Virginia. The court reasoned that "the effects of [the defendant's] alleged harassment, discrimination, and retaliation were felt by [p]laintiff where she lived and worked," not at the location of the corporate headquarters. *Id*. Similarly, in *Nathan*, 2012 WL 1886440, at *19, the court denied the defendant's motion to transfer in part because it found that the situs of material events in relation to the plaintiff's Title VII claim was in Illinois, where the plaintiff lived and worked. The court explained, "[e]ven assuming *arguendo* that all relevant employment decisions were made outside Illinois, neither Florida nor California constitute the situs of all material events because Nathan lived and worked in Illinois and felt the effects of [the defendant's] unlawful conduct here. *Id. See also Digan [v. Euro-Am. Brands, LLC*, No. 10-CV-799], 2010 WL 3385476, at *4 (N.D.

18

Ill. Aug. 19, 2010)] (explaining that there is "authority in this district for determining that venue is proper in the location in which a plaintiff felt the effects of a decision made in another district.").

Here, as in *Pryor* and *Nathan*, while ACE may have made the alleged unlawful employment decisions at its corporate headquarters in Indianapolis, Illinois is a more substantial situs of material events because Plaintiff "lived and worked in Illinois and felt the effects of [Defendants'] unlawful conduct here." *Nathan*, 2012 WL 1886440, at *19.

*Williams*, at *6.

In the instant case, Plaintiff suffered in Chicago from MLS's unlawful employment practice. Venue is proper in this District for Plaintiff's Title VII claim against MLS.

### 2. Plaintiff's allegations of unlawful employment practices by MLS's clubs are the legal equivalent of allegations of unlawful employment practices by MLS.

Although MLS attempts to distance itself from the actions of its clubs, it cannot because its clubs are an extension of itself since all comprise a single entity, as explained in *Nowak v. Major League Soccer, LLC,* No. CV 14-3503, 2015 WL 12803590 (E.D. Pa. July 20, 2015). While assessing whether diversity jurisdiction existed in *Nowak*, the court observed that MLS is a limited liability company and that "[e]ach Club within the MLS is owned by MLS but is operated by an owner-operator that is a member of MLS." *Id*. at *1 (noting "the distinct structure of MLS as compared to other professional sports leagues"). *See Fraser v. Major League Soccer, L.L.C*., 284 F.3d 47, 52 (1st Cir. 2002) ("MLS has, to say the least, a unique structure, even for a sports league. MLS retains significant centralized control over both league and individual Club operations. MLS owns all of the Clubs that play in the league . . . .").

Indeed, the actions of MLS's clubs are, for all purposes relevant herein, actions of MLS. Accordingly, Plaintiff's allegations of unlawful employment practices by MLS's clubs are allegations of unlawful employment practices by MLS.

19

### 3. MLS's claim of improper venue for Plaintiff's Title VII claim is contrary to public policy.

MLS's attempt to use Title VII's venue statute to drag Plaintiff to New York is completely contrary to the remedial purpose of Title VII and stands the venue provision on its head. After discriminatorily failing to hire an Illinois plaintiff, a defendant should not be able to avail itself of Title VII's venue provision by forcing an out-of-work plaintiff to travel halfway across the country to litigate.

This Court examined this public policy concern in *Luderus v. U.S. Helicopters, Inc.*, No. 12-CV-5094, 2013 WL 677814 (N.D. Ill. Feb. 25, 2013) when concluding that "forum selection clauses contained in employment agreements are unenforceable insofar as they preclude plaintiffs from filing Title VII claims in any of Congress's three preferred forums under 42 U.S.C. § 2000e–5(f)(3)." *Id.* at *5. In reaching its decision, the *Luderus* court explained that "[f]orum selection clauses that require plaintiffs to litigate in distant forums therefore threaten to significantly undermine Title VII's primary enforcement mechanism." *Id.* at *4. The *Luderus* court further stated:

> While no public policy interest is explicitly mentioned in the text of the special venue provision [of Title VII], such an interest is discernible by comparing the special venue provision to the general venue provision for civil actions, 28 U.S.C. § 1391, and by weighing the special venue provision's role in Title VII's overall enforcement regime.
>
> . . .
>
> While § 1391(b)(1) reflects an obvious Congressional desire to avoid inconvenience to defendants, Title VII's special venue provision reflects the opposite concern. Under 42 U.S.C. § § 2000e–5(f)(3), venue is considered proper in the judicial district in which the defendant maintains his principal office (presumably the most convenient forum for the defendant) only if the defendant is not found in 1) the state in which the alleged discrimination occurred; 2) the judicial district in which relevant employment records are kept; or 3) the judicial district in which the Plaintiff would have worked but for the alleged discriminatory practice—all districts that are presumably

more convenient for the plaintiff. *Id*. **The most plausible interpretation of Congress's choice to make the defendant's principal place of business the venue of last resort is that it was concerned "that national companies with distant offices might try to force plaintiffs to litigate far from their homes," and thereby chill private enforcement of civil rights by making private suits cost prohibitive.** *Passantino v. Johnson & Johnson Consumer Products, Inc*., 212 F.3d 493, 506 (9th Cir. 2000).

*Luderus*, at *3 (emphasis added).

### 4.    MLS has asserted no viable basis for venue elsewhere for Plaintiff's Title VII claim against MLS.

In an attempt to establish that venue is improper in this District, MLS argues, "Given that MLS is headquartered in New York, any alleged unlawful practice by MLS would have occurred in New York . . . ." (MLS Mot., p. 3, n.3.) MLS's proposed interpretation of where the alleged unlawful employment practice occurred is at odds with established law on the issue of venue for Title VII claims.

The location of MLS's headquarters has no bearing on where the alleged unlawful employment practice by MLS occurred for purposes of venue. The plaintiffs in *Doe #1 v. JetBlue Airways Corp*., No. 19-CV-1542, 2020 WL 4605216 (E.D.N.Y. Aug. 11, 2020), improperly attempted to establish venue for their Title VII claim in federal district court in New York, New York, by making this same misguided assertion of venue based on where the corporate defendant had its headquarters. The *Doe #1* court explained the fallacious reasoning of such argument, as follows:

> [A]ll of the unlawful employment practices alleged in the amended complaint occurred in Puerto Rico and Boston, not New York. Plaintiffs attempt to get around this fact by alleging that JetBlue's "pattern and practice ... of routinely ignoring employee complaints concerning sexual assault and/or sexual harassment" stems from their corporate headquarters in New York. . . . Yet, these allegations are too vague and conclusory to satisfy Plaintiffs' burden to establish venue. *See, e.g., Cook v. UBS Fin. Servs., Inc.*, No. 05-cv-8842, 2006 WL 760284 (SHS), at *3-4 (S.D.N.Y. Mar. 21, 2006) (finding plaintiff's allegations that employment policies

21

were developed in defendant's New York headquarters insufficient to establish venue because "it d[id] not necessarily follow ... that any of the specific personnel decisions affecting [plaintiffs] were made in New York"); *see also Robinson v. Potter*, No. 04-cv-890, 2005 WL 1151429, *4 (D.D.C. May 16, 2005) ("Mere speculation of principal office involvement does not counter the fact that in the plaintiff's complaint, the acts committed occurred [in a different district].").

*Id.* at *5.

Apparently in an attempt to establish that venue is proper elsewhere than this District, and while conspicuously and carefully avoiding any affirmative claim of having any "employment records" referenced in the second condition listed in Title VII's venue provision, MLS states merely hypothetically that "any relevant documents in MLS's possession would be maintained in New York." (MLS Mot., p. 3, n.3.) This argument of MLS, which MLS relegates to a footnote, is disingenuous at best and does nothing to establish that venue is improper in this District, nor could it.

As even MLS recognizes, "Title VII's exclusive venue provision also governs Plaintiff's Section 1981 and IHRA claims." (MLS Mot., p. 3.) As such, finding venue to be improper in this District with respect to Plaintiff's Title VII claim would ultimately have the effect of leaving none of Plaintiff's claims against MLS to be tried in this District alongside Plaintiff's claims against the other Defendants. It would be egregiously unfair to Plaintiff to split up this case into one or more forums outside Illinois when the one common denominator for all Defendants is that Plaintiff's rejection took effect in one common location: Illinois.

At this juncture, the Court must resolve any factual disputes and draw all reasonable inferences in Plaintiff's favor. *See Gilman Opco LLC v. Lanman Oil Co.*, No. 13-CV-7846, 2014 WL 1284499, at *2 (N.D. Ill. Mar. 28, 2014). Accepting the Complaint's factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently alleged

venue in this District for his Title VII claim against MLS. Accordingly, venue is proper in the Northern District of Illinois under 42 U.S.C. § 2000e–5(f)(3).

**B.** **Transfer to New York on the ground of *forum non conveniens* is inappropriate.**

MLS argues, alternatively, that it should be severed from this lawsuit and that the claims against it should be transferred to the Southern District of New York, where its corporate headquarters are located, pursuant to 28 U.S.C. § 1404(a). This argument does not withstand scrutiny.

Under Section 1404(a), MLS must establish to the Court's satisfaction that "(1) venue is proper in the transferor district, (2) venue and jurisdiction would be proper in the transferee district, and (3) the transfer will serve the convenience of the parties and witnesses and is in the interest of justice. The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Williams,* 2017 WL 2424227, at *5 (citation omitted).

In making this determination, the Court looks to both the private and public interests. Private interests include: (1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the relative ease of access to sources of proof; and (4) the convenience to the witnesses and parties. Factors traditionally considered in the public interest analysis, also known as the "interest of justice" factors, include the congestions of the respective court dockets, prospects for a speedy trial, and the courts' familiarity with the applicable law. *Id.*

The Northern District of Illinois is Plaintiff's chosen forum and is entitled to very significant weight.

> [T]he Supreme Court noted that 'there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum.' *See also In re National Presto Indus., Inc.,* 347 F.3d 662,

663-64 (7th Cir. 2003) (unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed).

*Williams,* at *6 (N.D. Ill. June 5, 2017). Accordingly, this factor favors Plaintiff.

For all of the reasons set forth at length in Point IV(A)(1), above, the situs of the material events, *i.e.*, the conveyance of the refusal to hire Plaintiff and the harm felt thereby, is in Chicago, Illinois, where Plaintiff and his agent have resided at all relevant times.

The relative ease of access to sources of proof is a neutral factor in this case. As the court in *Pryor* explained,

> When documents are easily transferable, access to proof is a neutral factor. Moreover, this is not a case in which the parties need access to non-documentary proof located in another forum. Although United has centralized at least some human resources functions in Chicago and maintains documents there, there is no reason to think that the documents cannot easily (and electronically) be transferred to Virginia or Texas. *Handler v. Kenneth Allen & Assocs., P. C.,* 2011 WL 1118499, at *3 (N.D. Ill. Mar. 24, 2011) (where "documents are easily transferrable, access to proof is a neutral factor") (citation omitted).

*Pryor,* 2013 WL 4506879, at *6 (citations omitted).

The reality of e-discovery is such that the parties will, in all likelihood, be placing their discoverable emails and work files into a database made accessible to the other parties. Depositions are now routinely taken over the internet via zoom or other software. This is not a case where there is any discovery that cannot be accomplished electronically, with all parties remaining in their respective places of business. This factor is therefore neutral.

Similarly, the convenience to witnesses and parties is rendered far less significant due to the use of remote video depositions. As for trials or evidentiary hearings, to the extent they need to be conducted in court in person, the burden is equal on both sides: one party or another is going to have to travel to the forum for the trial. Accordingly, this factor is also neutral.

Finally, the public interest factors as between two major cities like Chicago and New York are substantially equal on both sides. Both federal courts are more than capable of applying federal anti-discrimination law, and the difference between docket speed and congestion is not significant enough to warrant a transfer. If either party can be said to have a greater interest in a faster disposition, it would likely be the Plaintiff as the party waiting to have his day in court, his rights vindicated and compensation awarded. Plaintiff prefers its chosen forum.

Accordingly, all of the factors bearing on a transfer of venue under §1404(a) either favor Plaintiff or are neutral, and MLS's request for such a transfer should be denied.

## V.    The Complaint States Plausible, Legally-Cognizable Claims Against Every Defendant.

In their respective responses, Defendants MLS, USL, AMB and Las Vegas Soccer argue that Plaintiff's Complaint, on its face, fails in some respect to state a valid and plausible claim for relief, pursuant to FRCP Rules 12(b)(6) and/or 8(a). Plaintiff addresses each of these in turn.

### A.    Plaintiff has stated viable discrimination claims against MLS.

MLS argues that Hill did not apply for a job with the league and, therefore, cannot have a discrimination claim against MLS. It argues that Hill has not alleged that MLS "was responsible for [any of the Club Defendants'] hiring decisions." MLS Mot. at 5. Finally, it argues that Hill has only conclusorily alleged that MLS is an "employer" within the meaning of Title VII. *Id.* 5-6.

The Complaint plainly states at page 22 that, "G. The MLS and USL are Equally Responsible for the Discriminatory Effect of its Member Clubs' Hiring Practices." This heading statement is then supported by allegations relating to MLS's ability and authority to make policies that are binding on the clubs and to change discriminatory hiring practices. The Complaint further alleges that MLS is aware of the hiring decisions and practices of its clubs and their historically discriminatory effect – throughout the entire league. Compl. ¶¶ 146, 147, 151.

25

Notwithstanding that Plaintiff did not directly apply for a position with the league entity, MLS, the Complaint alleges a framework for holding MLS responsible for the repeated discriminatory acts of its member clubs. Moreover, given the shared ownership structure of MLS and its clubs and MLS's admitted control over player contracts, MLS can also be held responsible for the acts of its member clubs on a veil-piercing or other vicarious liability theory. *Summerland,* 510 F. Supp. 3d at 631 ("The Seventh Circuit reasoned that "[i]f . . . a parent (or other affiliate) would be liable for the torts or breaches of contract of its subsidiary, it ought equally to be liable for the statutory torts created by federal antidiscrimination law.") (citations omitted).

MLS's claim that Hill has not adequately alleged that MLS is an "employer" as defined in Title VII is inaccurate. In line with the requirements of notice-pleading under the Federal Rules, Plaintiff states the MLS is, in fact, an employer as defined in Title VII. Although not required to prove its allegations at this juncture, Plaintiff, nonetheless, does go on to describe the MLS as an employer of "technical staff and other employees," that engages in league-wide (*i.e.*, interstate) initiatives affecting commerce. Compl. ¶ 147. Although not specifically alleged in the Complaint, Plaintiff is prepared to prove at the earliest appropriate juncture that MLS hires more than 15 employees. *See* 42 U.S.C. § 2000e [Section 701] (Title VII employer definition includes "associations" of any kind, incorporated or not, "engaged in an industry affecting commerce who has fifteen or more employees[.]").

### B.     Plaintiff has stated viable discrimination claims against USL.

USL argues that Plaintiff has failed to state an actionable claim for employment discrimination because he simply lumps USL in with all of the Club Defendants, with whom USL is not equally situated, and fails to allege any discriminatory acts by USL. This is not accurate.

Similar to Plaintiff's allegations against MLS, the Complaint alleges a framework for holding USL responsible for the repeated discriminatory acts of its member clubs. He specifically alleges that, by the USL's own statements and pledges to require its member clubs to reform their hiring practices to remedy their league-wide discriminatory effects, the USL acknowledges that it has the ability to address discrimination by its clubs. Hill further alleges that USL is aware of the specific hiring activities of its clubs (hence its pledge to change them), and either tacitly or expressly authorized the discriminatory hirings complained of in this case. Compl. ¶¶ 149-151.

Accordingly, Hill has stated a claim for actionable discrimination against USL.

### C. **Plaintiff has stated viable discrimination claims against Las Vegas Soccer.**

Defendant Las Vegas Soccer argues that Plaintiff has failed to adequately allege that he was qualified and applied for an open position and was refused employment. This argument is difficult to fathom, in light of the following allegations in the Complaint: Hill was well-qualified for the position of head coach of Las Vegas Lights. Compl. ¶ 78. "On January 25, 2021, Keane, on behalf of Hill, visited Las Vegas and sent emails, texts, and voicemails to Lashbrook, asking for an opportunity to meet with him and discuss Hill's potential consideration for the then-open head coach and technical director position at the Las Vegas Lights. Lashbrook again failed to respond, and Hill was again passed over for the opportunity without explanation." Compl. ¶¶ 85-86. A white person was hired for the position instead. *Id.* ¶ 87.

Accordingly, the Complaint does not suffer from the infirmities claimed by Las Vegas Soccer.

### D. **Plaintiff has stated viable discrimination claims against Prodigal Soccer, LLC.**

Prodigal Soccer, LLC, argues that because Plaintiff's Right to Sue letter was addressed by the EEOC to "Prodigal, LLC," and Plaintiff sued "Prodigal Soccer, LLC," the action must be

27

dismissed as to the latter. In support of dismissal, Prodigal cites *Perkins v. Silverstein*, 939 F.2d 463, 471 (7th Cir. 1991). However, Prodigal has neither the facts nor the law correct.

Plaintiff filed its *EEOC Charge* against Prodigal Soccer, LLC, which is the named Defendant herein. Shebar Dec. Ex. B (EEOC Charge). For whatever reason, the EEOC issued a Right to Sue letter to Plaintiff, but cc'd "Prodigal, LLC" rather than "Prodigal Soccer, LLC." Shebar Dec. Ex. C (Right to Sue for Prodigal Charge). This is a mistake that was likely made because both entities have the same registered agent at the same address, and apparent common ownership. Shebar Dec. Ex. D (corporate info from Oklahoma Secretary of State for both entities). The Right to Sue letter bears the same charge number as the EEOC Charge.

Clearly, we are dealing with a technical error by the EEOC, using the wrong entity name to address the copy of the Right to Sue letter (but the correct registered agent and correct EEOC charge number). Defendant Prodigal does not argue that the entity that Plaintiff sued is not a proper party, *i.e.*, does not own the OKC Energy soccer club. It argues only that the entity on the Right to Sue letter doesn't match the entity sued. This should not be a basis for dismissal, especially as the named defendant obviously received notice from the same registered agent.

[This section left intentionally blank]

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an order (i) denying each of the Defendants' respective Motions in their entirety; (ii) in the alternative, if the Court decides to grant any Defendant's motion to dismiss in whole or in part, granting the Plaintiff the opportunity to amend the Complaint to remedy any asserted defects in the pleading; and (iii) granting Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

RICKY HILL

By:    /s/Steven M. Shebar
One of Plaintiff's attorneys

SHEBAR LAW FIRM
0N370 Fanchon St.
Wheaton, Illinois 60187
(630) 877-6833
steveshebar@shebarlaw.com

Lisa K. Shebar
LAW OFFICE OF LISA K. SHEBAR
110 N. Gables Blvd.
Wheaton, IL 60187
(630) 877-6829
lisa.shebar@gmail.com

*Attorneys for Plaintiff*